## Kershow Estate

*Duane, Morris & Heckscher,* for accountant.

*Paul Maloney,* for trustees.

*Benjamin R. Neilson* and *H. Ober Hess,* for charitable residuary legatee.

SHOYER, J., September 7, 1966.—This trust arises under the will, a copy of which is hereto annexed, of J. Henry Kershow, who died March 17, 1918, whereby the testator gave two twenty-fifths of his residuary estate to his trustee, in trust, to pay the income to his cousin, Jennie Ketcham Quick, during her life, with "full right and power" in her to dispose of the remainder of the fund by her will, provided that if she did not leave a will disposing of this portion of his estate, then the principal thereof should "remain and become part of my residuary estate, and divided among the other persons herein mentioned and entitled to the same, in the same ratio, and under the same provisions as shall apply to each one of them respectively at the time of the death, under the above circumstances, of my said cousin". Other portions of the residuary estate were given to the persons and to the several charities as reflected in the statement of proposed distribution. . . .

This account was filed because Jennie Ketcham Quick, later Owen, life tenant, died January 29, 1965. She left a will upon which letters testamentary were granted by the Surrogate of Hunterdon County, New Jersey, to Fidelity-Philadelphia Trust Company and George Edward Woodruff, executors. . . .

By her will, a copy of which is hereto annexed, Jennie K. Owen provided, in item ninth, a gift of her residuary estate, including:

". . . all property over which I have any power of appointment, particularly under the Wills and Trusts of J. Henry Kershow and Carlton W. Kershow, which powers I hereby exercise in favor of this my residuary estate, I give, devise and bequeath to the FIDELITY PHILADELPHIA TRUST COMPANY and GEORGE EDWARD WOODRUFF, IN TRUST, NEVERTHELESS, for the following uses and purposes:

"To hold, manage, invest . . . and . . . pay over

and apply all of the net income to or for the benefit of my nephew, GEORGE EDWARD WOODRUFF, for and during the term of his natural life, and at his death, . . . the corpus of this trust . . . shall be paid, free of trust, as he may in his Last Will and Testament appoint, or in default or failure thereof, to my heirs and next of kin, as of the date of my death." . . .

### VALIDITY OF THE EXERCISE OF THE POWER OF APPOINTMENT

By instrument dated October 29, 1951, executed by Jennie K. Owen, donee-life tenant, after referring to the power of appointment given her by the will of J. Henry Kershow, deceased, she in pertinent part provided:

"Intending to be legally bound, I hereby irrevocably release the right to exercise that power in favor of myself, my estate, my creditors or the creditors of my estate".

Accountant, in its notice to the parties in interest and counsel for trustees appointed under item ninth of the will of Jennie K. Owen, deceased, take the position that donee's *partial* release of her power of appointment did not prevent her from appointing her share of principal to the *residuary legatees* under her will, and that she effectively did so appoint the share of principal to her trustees for the benefit of her nephew, George Edward Woodruff, for life. We are now not concerned with the disposition of the remainder of the appointed share.

The validity and interpretation of the attempted exercise of the power is governed by the law of Pennsylvania, the domicile of the donor of the power, even though donee died domiciled in New Jersey: Windolph Trust, 374 Pa. 81 (1953); O'Reilly Estate, 371 Pa. 349 (1952); Barton Trust, 348 Pa. 279 (1944).

In Barton Trust, supra, the court said, pages 281-82:

"In executing a power of appointment the donee disposes of the estate as that of the donor, the appointment being referred back to the instrument which created the power as if it had been actually embodied therein, . . . and it has been uniformly held that the proper and effective exercise of a power of appointment is, in the case of personalty, controlled by the law of the donor's domicile at the time of the creation of the trust: [citations]".

The power of appointment is releasable in whole or in part and may be released in such manner as to reduce or limit the persons or objects or classes of persons or objects in whose favor such power or interest would otherwise be exercisable: Estates Act of April 24, 1947, P. L. 100, sec. 3(a), as amended, 20 PS §301.3(a); Jeffers Estate, 394 Pa. 393, 396 (1959).

In a footnote in Jeffers Estate, supra, the Supreme Court noted, page 397:

"The law applicable to release of powers of appointment is completely influenced by federal tax considerations arising from the revisions of the Internal Revenue Code since 1942. Our Pennsylvania acts relative to release of powers of appointment sought to take advantage of the permitted federal tax benefits. See 5 Am. Law of Prop. §23.25 (1952)".

See also Handy Trust, 5 D. & C. 2d 773, 775, 6 Fiduc. Rep. 385, 387, where Judge Bolger of this court observed: "It is well recognized that the release signed by the donee of the power was filed to comply with the provisions of the Federal tax law and was filed under the authority of the Estates Act of April 24, 1947, P. L. 100, 20 PS §301.3, or its predecessor, the Act of 1943, P. L. 797, as amended by the Act of 1945, P. L. 1337".

And Mr. Bregy, in his treatise "Intestate, Wills and

Estates Acts of 1947", has commented pointedly: "As most people apparently would rather avoid taxation than own a power, there was a general rush to release powers after the Revenue Act of 1942 became law", (at page 5206). Especially was this true in reducing general powers to special powers. For this purpose, many draftsmen adopted the language of the Internal Revenue Code, 26 U.S.C.A. §811(f), where a general power of appointment is defined as a power which is exercisable "in favor of the decedent [donee], his estate, his creditors or the creditors of his estate". So in Handy Trust, supra.

In Windolph Trust, 374 Pa. 81 (1953), the court ruled, page 87:

"In determining whether a power of appointment was validly exercised and if so, its meaning, the Courts seek to ascertain the intent of the donee and this must be ascertained in precisely the same manner as a testator's intent is discovered in a will: *Lewis Estate*, 349 Pa. 571, 37 A. 2d 482. This intent is ascertained and determined only from the meaning of the words used and not from what a Court or an advocate thinks the donee meant to say what he likely would have said if he had known the existing circumstances; the test is: What is the meaning of his words in the light of all the surrounding circumstances: [citations]".

The "surrounding circumstances" here are, of course, the tax saving benefits provided by Congress to a donee who surrenders his *general power* of appointment in favor of a limited *special power*. There is no reason to believe that Jennie K. Owen, donee here, was motivated by any other purpose when she executed the release in 1951. Of significance is the admission by counsel for the opposing charity that such was the purpose of her release.

Furthermore, since the Estates Act (section 3) is

in pari materia with the Act of Congress of 1942 and its amendments, these two laws should be construed together: Statutory Construction Act of May 28, 1937, P. L. 1019, sec. 62, 46 PS §562. Construction of donee's testamentary intent must of necessity involve consideration of these two statutes and the legislative intent behind them.

Cognizant of this statutory background, we are reminded that item ninth of donee's will disposes of: (1) donee's *entire residuary estate* and (2) "all property over which I have any power of appointment, particularly under the Wills and Trusts of J. Henry Kershow and Carlton W. Kershow, which powers I hereby exercise in favor of this my residuary estate. . . ." Donee's will *does not* exercise the power in favor of her own "estate". This she foreswore previously by her partial release: Cf. Shipley's Estate (No. 2), 337 Pa. 580 (1940).

The phrase "residuary estate", as used by donee in exercising her *self-limited* power of appointment, is not, as contended by counsel for the Children's Aid Society, synonymous with the phrase "my estate" used by her in her partial release. "Residuary estate" is that which remains after the payment of creditors and all of the specific and general bequests and devises: Wood's Estate, 209 Pa. 16 (1904) ; Grier Estate, 403 Pa. 517, 521. While the theorems of geometry, which maintain that the whole is greater than any of its parts, may raise a seeming paradox, this difficulty is disspelled by the above definition of "residuary estate", especially when contemplated against the background of the statutes which we have just considered.

Clearly, had donee in *separate paragraphs* of her will made the same disposition of her residuary estate and of her self-limited appointive share, as she did in item ninth, i.e., to her trustees in trust for her nephew for life, it could not be successfully contended that she

had violated the terms of her partial release. Such a separate gift would not subject the gift to donee's creditors, the creditors of her estate, or for the purpose of paying her pecuniary legatees.

Nor will a blending of donee's estate with the appointive share be presumed: Shipley's Estate (No. 2), 337 Pa. 580.

In Shipley's Estate, supra, the Supreme Court found that there was no blending for the purpose of paying pecuniary legacies where testatrix had directed distribution of her appointive estate by her executor along with her residuary estate. The court said, page 585: "When in the last half of that clause she 'included all property' she had power of appointment over, she was including it in the *rest, residue and remainder* of property undisposed of, up to that point, and not in all the property she had to dispose of *when she began her will*". (Italics in original.)

Lastly, I am not impressed by the argument of counsel for the charity that donee was consciously "attempting" to give the appointive assets "a new start" for the purpose of evading the rule against perpetuities. I cannot impute to her the willful intent to accomplish a result prohibited by law. Such argument is devoid of merit.

In view of the foregoing, I find as a fact that Jennie K. Owen intended to and effectively and validly appointed the principal of this trust to Fidelity-Philadelphia Trust Company and George Edward Woodruff, trustees, in trust for George Edward Woodruff for life. An award will be made accordingly.

Annexed hereto is the copy of the notice to the Attorney General of the Commonwealth of Pennsylvania as parens patriae of gifts to charities and his clearance certificate in accordance with Pennsylvania Orphans' Court Rule *55.

The statement of proposed distribution and report

filed pursuant to Pa. O. C. R. 69.4 indicate the search that was made by the accountants to ascertain the whereabouts of James A. Robinson, one of the contingent beneficiaries. Although this beneficiary did not receive notice of the audit, I find that the interest is similar to that of the charity that was so ably represented at the audit.

It is appropriate to note that since resolution of the question of the validity of the exercise of the power of appointment is fraught with possible tax consequences, the auditing judge directed that notice of the audit be given to the Federal and State taxing authorities. By letter dated July 19, 1966, hereto annexed, Drew J. T. O'Keefe, Esquire, United States Attorney for this district, advises that the Internal Revenue Service has decided not to intervene in these proceedings. . . .

And now, September 7, 1966, the account is confirmed nisi.